749 So.2d 353 (1999)
In the Matter of the DISSOLUTION OF the Marriage Gerlinde Ulm SANFORD, Appellant,
v.
William F. SANFORD, Appellee.
Nos. 97-CA-00651-COA, 97-CA-01503.
Court of Appeals of Mississippi.
October 12, 1999.
*354 Jolly W. Matthews III, Hattiesburg, Attorney for Appellant.
Anthony Sakalarios, Hattiesburg, Attorney for Appellee.
BEFORE SOUTHWICK, P.J., BRIDGES, AND IRVING, JJ.
SOUTHWICK, P.J., for the Court:
¶ 1. This is an appeal from a judgment in the Chancery Court of Lamar County that denied a motion to set aside a divorce that had been granted on the grounds of irreconcilable differences. We find sufficient doubt about the wife's agreement to the divorce to cause reversal and a remand.

FACTS
¶ 2. William F. Sanford and Gerlinde Ulm Sanford were married in 1966 but have lived in separate parts of the country for the last fifteen years. Mrs. Sanford worked as an associate professor of German and German literature at Syracuse University in New York. Mr. Sanford engaged in various pursuits in Mississippi. A complaint for divorce was filed on July 7, 1997. The parties prepared a settlement agreement and met with the chancellor on August 13, which was prior to the passage of the statutorily required sixty days. The chancellor informed them of the need to delay further. A hearing was then held on October 31, 1997. Mrs. Sanford was not represented by an attorney at this hearing. She was asked several times by the chancellor if she desired counsel. She said that she did not. Following an off-the-record meeting in the chancellor's chambers, Mrs. Sanford agreed to a divorce on the basis of irreconcilable differences, but only by nodding her head affirmatively.
¶ 3. Soon after the divorce Mrs. Sanford finally retained counsel and petitioned the court to set the decree aside. After conducting a hearing at which Mrs. Sanford testified, the chancellor by order of March 24, 1998, refused to set aside the divorce. Mrs. Sanford has appealed.

DISCUSSION
¶ 4. Though there is some allegation of fraud on appeal, Mrs. Sanford's principal contention is that she never wished a divorce and made that plain in the trial court. At the hearing she reluctantly *355 nodded assent only because of a mistaken belief that her husband could get an irreconcilable differences divorce regardless of whether she agreed to it.
¶ 5. Evidence of her opposition to the divorce is offered in the form of letters written by her both to the court and to her husband's attorney. These letters were written beginning immediately after the August 13 meeting with the chancellor and continuing even after the October 31 divorce. They express Mrs. Sanford's strong desire not to be divorced. She pleads with the chancellor not to "force" her to be divorced. She requested the chancellor's assistance in convincing her husband to avoid divorce. She also proposed that she be able to adopt the baby that her husband had fathered with his present girlfriend, and thereby with her husband attempt to start their marriage anew.
¶ 6. Had Mrs. Sanford followed both the chancellor's and opposing counsel's advice to get her own lawyer, presumably the predicament in which she says that she now finds herself could have been avoided. In a statement striking and poignant for its probable uniqueness in appellate records, she stated in a pre-divorce letter that she regarded retaining counsel as an act of disloyalty to her husband. On several occasions and in several ways she revealed her belief that a divorce was inevitable and would be granted regardless of whether she agreed.
¶ 7. There is support for this belief in her letters to the chancellor and to her husband's counsel, Anthony Sakalarios. In addition, a letter to her from Mr. Sakalarios stated in part, "You need to reconcile yourself that there is going to be a divorce[;] it is just a question about whether or not it can be done amicably and that it is fair to everyone or whether it is going to be battled out in the courtroom." That may well be a fair analysis of the situation and at the very least a reasonable statement for opposing counsel to make considering that his client was alleging constructive desertion as fault-based grounds if Mrs. Sanford would not agree to a divorce. However, the evidence to prove who, if anyone, deserted whom is not in the record.
¶ 8. Mr. Sanford's interpretation of events is that his wife ignored repeated advice to retain counsel and instead resigned herself to the inevitability of the divorce. Helping to convince her was the fact that at the hearing some mention was made that her retirement pension from the university might be equitably divided if a fault-based divorce were ultimately granted. In Mr. Sanford's view her consent was voluntary and no grounds for setting the divorce aside were shown. The chancellor agreed.

Issue 1: Mrs. Sanford's agreement to and understanding of the divorce
¶ 9. The starting point is that an irreconcilable differences divorce in Mississippi requires that neither spouse contest its granting. Miss.Code Ann. § 93-5-2(5) (Rev.1994). This does not mean that both spouses must fervently desire a divorce. Unless a spouse exercises the right to contest it, a decree of divorce may be entered.
¶ 10. How objections are expressed is partly explained in the statute:
(5) Except as otherwise provided in subsection (3) of this section, no divorce shall be granted on the ground of irreconcilable differences where there has been a contest or denial; provided, however, that a divorce may be granted on the grounds of irreconcilable differences where there has been a contest or denial, if the contest or denial has been withdrawn or cancelled by the party filing same by leave and order of the court.
Miss.Code Ann. § 93-5-2(5) (Rev.1994). A cross-complaint or counterclaim may be a contest to a divorce; a second complaint, inconsistent with the first complaint that was jointly filed, may also serve as a contest. Massingill v. Massingill, 594 So.2d *356 1173, 1177 (Miss.1992); McCleave v. McCleave, 491 So.2d 522, 523 (Miss.1986). Though neither is the situation here, we do have considerable pro se equivalents of contests to the divorce.
¶ 11. Wavering on whether a divorce should be entered may often occur and does not invalidate the divorce. During the sixty day period for reflection after the filing of a divorce complaint, there may be oscillating from complete agreement to complete opposition and every level between. What is important is that agreement be validly expressed on the day that the chancellor is considering the issue. Mrs. Sanford did not vacillate prior to the hearing: her opposition to the divorce was constant and frequently expressed. The record contains nine lengthy letters from Mrs. Sanford to the chancellor. The first one was sent a few days after the abbreviated court appearance in August 1997 and others followed even after the decree of divorce was granted. All of these letters expressed Mrs. Sanford's strong desire not to be divorced from her husband. Some indicate her misunderstanding of the process by which a divorce is granted in Mississippi. She stated repeatedly in her letters that she thought she had no choice in the matter and that her husband could get a divorce regardless of whether or not she objected to it.
¶ 12. Among the statements in her letters were these:
I do not want to be divorced, I would like nothing more than finally to be permitted to live in peace and happiness with my husband. If the law does not provide help for cases as mine and forces me to be divorced, then the property settlement as drawn up by me and submitted to you on August 13 seems to me the appropriate reflection of the grave injustice I find myself subjected to by being forced into divorce. (September 29, 1997)
For me to be forced into divorce and to have nobody anymore to belong to in this country, neither husband, nor child, nor other family, that would be shattering. (October 22, 1997)
I am so upset about so many things. Most of all of course the divorce. Perhaps you could have told me if ever there are cases when a divorce is not granted. I only agreed because I thought that in the end there would always be the divorce, and the trial would only have been a dispute about the property settlement. (October 31, 1997, later in the same day that the divorce was granted.)
(Italics added; underlining in original.)
¶ 13. The chancellor responded to the first letter sent him, encouraging Mrs. Sanford to obtain an attorney and not to write him letters. He placed the letters in the court file and notified Mrs. Sanford that he was doing so. Indeed, throughout these proceedings the chancellor diligently attempted to direct Mrs. Sanford to consider the benefits of obtaining an attorney. Though we reverse, we do not fault the chancellor for any lack of fairness in addressing the difficulties that Mrs. Sanford's persistent refusal to get an attorney was causing. Most importantly, at the hearing which resulted in the granting of a divorce, the chancellor was concerned about Mrs. Sanford's willingness to proceed. The chancellor said "[y]ou have emotions and feelings about it [the divorce] that might not necessarily coincide with what you're agreeing to do, but you with the nod of your head tell me that this is what you want to do at this time?" Mrs. Sanford nodded in an affirmative manner.
¶ 14. The chancellor granted the divorce, but later the same day Mrs. Sanford wrote him another letter saying that she had been emotionally overwhelmed at the hearing. As quoted above she said that "[p]erhaps you could have told me if ever there are cases when a divorce is not granted. I did not want a divorce." She wrote that she would deliver the letter to the chancellor's house before she left to return to New York.
*357 ¶ 15. Mrs. Sanford finally obtained counsel after these events. On November 26, 1997, a little less than thirty days after the decree, her attorney filed a motion to set it aside. Counsel alleged that a letter from Mrs. Sanford to the court on November 3, which was within ten days of the October 31 decree, constituted an adequate pro se motion for new trial under Rule 59 and regardless the new motion could be treated as a motion for relief from judgment under Rule 60. M.R.C.P. 59 & 60. Accident, mistake, and fraud were alleged as grounds. The chancellor's ruling on the motions on March 24, 1998, never explicitly indicated whether he treated the November 3 letter as sufficient to invoke Rule 59. The only motion referenced was the formal November 26 motion.[1]
¶ 16. We do not decide this appeal based on whether the chancellor had a valid new trial motion before him or only one for relief from judgment. An appeal from a denial of a Rule 59 motion may address the merits of the entire underlying proceeding, while review of a denial of a Rule 60 motion considers only whether a judge abused the broad discretion granted by that rule. See Overbey v. Murray, 569 So.2d 303 (Miss.1990). Even so, as we discuss below the question here is whether Mrs. Sanford sufficiently demonstrated that on October 31 she was not consenting to the divorce. Adequate proof of that would have required the granting of a motion under either rule. To avoid needless discussion of whether Mrs. Sanford's November 3 letter was a Rule 59 motion, our review will proceed as if this is solely an appeal of a denial of a Rule 60 motion.
¶ 17. An agreed judgment for divorce is not exempt from challenge under Rule 60. Askew v. Askew, 699 So.2d 515, 520 (Miss.1997). What has to be shown is this:
(1) fraud, misrepresentation or other misconduct of an adverse party;
(2) accident or mistake;
(3) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b);
(4) the judgment is void;
(5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application;
(6) any other reason justifying relief from the judgment.
M.R.C.P. 60(b). Mrs. Sanford alleges that relief from this judgment should have been granted under reason (1), (2) or (6). The complaint is that the judgment was in reality not an agreed one.
¶ 18. The relief provided under Rule 60(b) is extraordinary. Despite the chancellor's knowledge of the reluctance with which Mrs. Sanford entered this divorce, he was correct to insist upon a showing of exceptional circumstances before granting relief. The supreme court has held that "neither ignorance nor carelessness on the part of an attorney will provide grounds for relief. Additionally, it has been said that a party is not entitled to relief merely because he is unhappy with the judgment, but he must make some showing that he was justified in failing to avoid mistake or inadvertence; gross negligence, ignorance of the rules, or ignorance of the law is not enough." String-fellow v. Stringfellow, 451 So.2d 219, 221 (Miss.1984) (citation omitted).
¶ 19. What this case reveals is Mrs. Sanford's ignorance of court procedures applicable to divorce, and specifically a mistaken belief first revealed in the letters to the *358 chancellor that Mr. Sanford was legally entitled to a divorce merely because he wished to have one. Judge Thomas made some attempt to educate Mrs. Sanford in his response letter to her on September 2, 1997, explaining that "a divorce on the grounds of irreconcilable differences will not be granted without the requisite showing of consent by both parties and of a fair and adequate division of all marital properties as contemplated by Mississippi statutory law." Subsequent correspondence from Mrs. Sanford reveals that she still did not understand that her consent was required for an irreconcilable differences divorce:
If you see the remotest possibility that through a trial the divorce as such might be avoided, then I am very eager to come to trial. (September 29, 1997)
She also continued to state that she did not wish to hire an attorney:
1) To hire an attorney seems to me synonymous to betraying my love, affection and loyalty to my husband. 2) An attorney would most likely only be able to defend my material rights, yet would not be able to protect me from being divorced. (September 29, 1997)
¶ 20. To what extent the chancellor again tried to disabuse Mrs. Sanford of this view at the hearing is unclear, as what apparently convinced her to proceed with the divorce occurred off the record in a meeting in chambers. Upon returning from that conference, Mrs. Sanford made the previously mentioned nod of the head to answer the chancellor's question of whether she agreed to proceed with the divorce. It is not a judge's obligation to be counsel for any unrepresented party. The chancellor encouraged Mrs. Sanford to seek counsel, but she wished to proceed without one. On the other hand, if the effect of that pro se status is to create a situation that falls within the grounds for relief from judgment, relief should not be denied just because the litigant dismissed earlier suggestions that she acquire an attorney.
¶ 21. Later in the same day after the hearing was over Mrs. Sanford wrote that she still did not wish to have a divorce and indicated that she did not understand that a divorce sometimes is denied. That was strong evidence of the mistake that animated her decision to agree to the entry of a decree. Under some federal case law, the "mistake or excusable neglect of a party not represented by counsel" has been grounds for granting relief from judgment. 11 CHARLES ALAN WRIGHT, ARTHUR MILLER & MARY KAY KANE, FED. PRAC. & PROC., § 2858 at 163 (1973). When interpreting a state procedural rule, the supreme court has stated that it will consider the construction given the similar federal rule. Stringfellow, 451 So.2d at 221.
¶ 22. To appreciate Mrs. Sanford's understanding, we examine a portion of the testimony at the hearing on the motion to set aside the judgment of divorce. Her attorney's questions elicited these responses:
Q. Now Ms. Sanford, this series of correspondence that you're sending to the judge, without going through and reading approximately eight letters here, your basic premise in all these letters was to tell the judge what?
A. That I wanted no divorce and that I would want to do anything I could in order not to have a divorce.
Q. All right, but on October 31, you were here in this courtroom?
A. Yes.
Q. And you came in and y'all approached the bench? Well, let me back up. Before you got here and met with the judge, did you meet with Mr. Sakalarios and your husband?
A. When I arrived here, Mr. Sakalarios took my husband out and talked to him for aboutout this door, and then he took me out and started to talk to me about possibly irreconcilable procedure or so, but he didn't talk to me long at all because we were already coming into court, and then 

*359 Q. Do you remember what he told you?
A. He told me that maybe we could talk aboutI don't really remember exactly, I don't think. Maybe he talked about that we could resolve it on an irreconcilable difference basis. I don't recall.
Q. You don't remember?
A. No.
Q. All right, and he started asking you some questions?
A. Yes.
Q. And at some point in time he recessed that and took you and your husband and Mr. Sakalarios in chambers; didn't he?
A. That is correct, yes.
Q. All right, and while he was in chambers, what did you discuss?
A. We discussed, was I could not possibly adopt the child Bill's girlfriend is expecting. We also discussed my wish to turn all my property over to Bill, and we discussed irreconcilable differences, and that's just about it.
Q. All right. At that point in time did you agree to an irreconcilable differences divorce?
A. I agreed to it because I was so upset and confused about that I had not expected such a discussion to have been at all, and I was also upset about Mr. Sakalarios kind of even laughing at my suggestion that I would want to adopt Bill's child or that we would adopt it together. I don't think it's such a ridiculous thing at all.
Q. All right. What else did you discuss in chambers?
A. I cannot recall anything else.
Q. All right. At that point in time what was your state of mind, what was your demeanor?
A. I was extremely upset. I felt kind of coerced by the whole situation there, that we were talking there, and I was also very tired. I had only arrived on the day before by plane, and I did not feel well at all, and then I agreed to this procedure, I believe, because I was sorry for my husband and also because I was under the wrong understanding that no matter what I did, I would have to be divorced, and it is only actually yesterday from you that I found out for sure that if I'm not proven guilty, that I don't have to be divorced, but I asked this question often before, and he never gave me an answer to this, and I do not feel guilty of any offense to prove him eligible for divorce in Mississippi.
Q. So from all those discussions you thought that whether you agreed or not, Bill could get a divorce 
A. Yes.
Q. if you didn't agree to it?
A. Right, and I thought that the thing would maybe be a discussion on the property issue, but to me it isthe divorce is such it is very, very important to me, and all the other things are not so important.
¶ 23. The chancellor found that at the earlier hearing she had agreed to the divorce. He then stated that he believed "the same result would occur at another hearing on the same issues" and that no "lack of information" regarding procedures had led to the earlier consent. We assume that the finding that "the same result would occur at another hearing" means that he believed Mrs. Sanford again would consent. That is perhaps based on the chancellor's judging her demeanor. If instead he meant that a divorce would be granted at least on fault grounds if she had not consented, that finding is not sustained by the record since the parties never presented meaningful evidence on desertion.
¶ 24. Whether to grant relief from judgment is committed to the sound discretion of the trial judge. Stringfellow, 451 So.2d at 221. With considerable respect for the efforts of the chancellor to manage this difficult case, we still find overwhelming evidence that Mrs. Sanford *360 opposed the divorce and operated under significant confusion concerning central issues in the case. Within hours of the divorce being entered, she was revealing that confusion anew to the chancellor. A prompt request to set the whole decree aside was made. The background for the hearing must include Mrs. Sanford's letters, which continually showed her objection to having any divorce entered.
¶ 25. Though an argument in this precise setting has not apparently arisen on a previous appeal, the general issues have been addressed. In one case a husband appealed the denial of his motion to set aside a judgment of divorce. The supreme court reversed the denial of the motion, saying through Justice Joel Blass that the "court has not favored final decrees which are the product of surprise, accident, mistake or fraud." King v. King, 556 So.2d 716, 719 (Miss.1990). Though the facts are considerably different than here, in another appeal the supreme court reversed a chancellor's refusal to set aside a property settlement. Peterson v. Peterson, 648 So.2d 54 (Miss.1994). There was a procedural error, but the court also was concerned that confusion had surrounded the case from its inception. Id. at 56-57. That is conclusively proven to be true here as well.
¶ 26. Mrs. Sanford's persistent misunderstanding of Mississippi's divorce law was coupled with the fact that she was unrepresented by counsel. Her letters indicated an individual who found divorce repugnant to her personal values, so much so that she was willing to go to the extraordinary lengths of offering to reconcile with her husband and adopt his baby that he had with a mistress.
¶ 27. At best there was one moment in time, expressed with a nod of the head, during which Mrs. Sanford was willing to proceed towards an agreed decree of divorce. At all other times before and after she displayed visceral opposition to it. In that situation we believe the only proper exercise of discretion was to grant her promptly filed request for relief from judgment. This is especially true since she was not represented by counsel despite the chancellor's best efforts to convince her to employ one.
¶ 28. A few words may be appropriate about what we are not holding. Mrs. Sanford is a native of Austria and argues that part of the reason for the result of the trial proceedings was that her command of English was imperfect. However, there is no significant evidence that unfamiliarity with the English language led Mrs. Sanford into this situation. She appears at least in the written word to be able to express herself with great clarity. Perhaps oral communications are somewhat more difficult for her, but the chancellor made every reasonable effort to advise her of what was occurring. Moreover, second thoughts about what has been agreed probably follow many compromises of litigation. No matter how soon those doubts arise, a litigant is not ordinarily entitled to unravel the agreement. Whether an agreed divorce should be treated as just another settlement of a dispute, subject to no more protection for the parties than any other compromise, need not be addressed. It is enough to say that a sufficient basis for relief from this judgment has been shown: Mrs. Sanford was unrepresented; she indicated several times her misunderstanding of her husband's right to a divorce merely by wanting one; she expressed frequently her opposition to the divorce; and not least of all, she promptly sought to undo the agreement.

Issue 2: Fraud
¶ 29. Mrs. Sanford argues that her husband and his counsel misled her regarding property values underlying the property settlement. On this record, we do not find meaningful evidence to support the claim. Regardless, the issue is irrelevant since we are reversing the decree of divorce which nullifies the property settlement.
¶ 30. THE JUDGMENT OF THE LAMAR COUNTY CHANCERY COURT IS REVERSED AND REMANDED FOR PROCEEDINGS CONSISTENT WITH *361 THIS OPINION. COSTS OF THIS APPEAL ARE ASSESSED AGAINST THE APPELLEE.
McMILLIN, C.J., KING, P.J., BRIDGES, DIAZ, IRVING, LEE, MOORE, AND PAYNE, JJ., CONCUR.
BRIDGES, J., CONCURS WITH SEPARATE WRITTEN OPINION, JOINED BY LEE, MOORE, PAYNE AND THOMAS, JJ.
BRIDGES, J., concurring:
¶ 31. I agree that the case should be reversed and remanded for proceedings in line with the majority opinion, however I feel compelled to comment on the possible confusion our lower courts may experience when chancellors try to reconcile the adamant wishes of a pro se party with the guidance of the majority opinion.
¶ 32. Domestic cases present some of the most difficult challenges our trial judges face in their daily struggle to balance the legal and equitable rights of those who seek redress in their courtrooms. These challenges are complicated further when a party to those proceedings chooses to appear pro se. In these unique situations, the wide discretion of the chancellor is not only recognized by this Court, but deferred to in all possible cases.
¶ 33. In the case sub judice, it appears from the record that the chancellor was entirely correct in following the existing procedure, such as it is, while dealing with this perplexing situation. Unfortunately, in spite of heeding all necessary precautions, there is cause to preserve the right of Gerlinde Sanford to contest the action, although done outside the strict rules of practice. Miss.Code Ann. § 93-5-2(5) (Rev.1994) states in pertinent part that no divorce shall be granted on the ground of irreconcilable differences where there has been a contest or denial. I concur with the majority in finding that her letters to the court were in substance, if not in proper form, a valid statement of her wishes for the divorce to proceed, if at all, on grounds other than the mutual consent of irreconcilable differences.
¶ 34. It should be noted that we venture into dangerous waters when we ask the lower courts to interpret handwritten letters and oral requests as pro se equivalents to contests of divorce and ore tenus motions and then question their navigation of these waters without offering them a compass or clear direction. Perhaps it is time for this Court or the Supreme Court of this state to offer that much needed guidance in an area as uncharted as pro se representation in domestic matters. For example, rather than grant the divorce that day, the chancellor could admonish the party on the record explaining what will result from entry of the final decree. Then, the chancellor could delay entry of the final decree for a short period of time, leaving ample opportunity for the aggrieved party to retain counsel and file any necessary motions to protect their rights and alleviate any confusion that may have resulted from a miscommunication.
¶ 35. Whatever procedural changes are ultimately adopted, any modification would be a welcome change as the status quo leaves our lower courts guessing at what qualifies as an abuse of their wide discretion.
LEE, MOORE, PAYNE AND THOMAS, JJ., JOIN THIS SEPARATE OPINION.
NOTES
[1] Simultaneously with that motion, presumably because of uncertainty about whether the time for appeal was tolled by his client's filing a letter within ten days of the judgment, counsel filed a notice of appeal from the October 31 decree. Another notice was filed after the chancellor refused to set the decree aside. The two appeals are consolidated here for decision.